IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WALDEN HAGELMAN, SARAH ANDREWS, ANDIE HADDAD, DANA HAVLIN, ERIKA DE LOS SANTOS, LUKE FISHER, ROSE COLLINS, SUZANNE EDWARDS, and SARAH ALESSANDRO. | § § § § § § | CIVIL ACTION NO. 1:22-cv-988 |
| *Plaintiffs*, | § § § | JURY TRIAL DEMANDED |
| v. | § | |
| AUSTIN INDEPENDENT SCHOOL DISTRICT. | | |
| *Defendants*. | | |

**FIRST AMENDED COMPLAINT**

Plaintiffs Walden Hagelman, Sarah Andrews, Andie Haddad, Dana Havlin, Erika De Los Santos, Luke Fisher, Rose Collins, Suzanne Edwards, and Sarah Alessandro (together "Plaintiffs"), by and through their attorneys, bring this action against Defendant Austin Independent School District ("AISD") and allege as follows:

**INTRODUCTION**

1.     Plaintiffs seek damages, legal and other equitable relief from Defendant for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, 42 U.S.C. § 1983, *et seq.*, and any other causes of action(s) that can be inferred from the facts set forth herein.

2.     Plaintiffs are all alumni of James Bowie High School ("JBHS") who were involved in the Starlight Theatre Company ("STC") under the direction of Betsy Cornwell ("Cornwell").[1] During their time at JBHS, Plaintiffs were subjected to inappropriate and illegal behavior by

---

[1] Upon information and belief, Cornwell has been the director of STC since 1988.

Cornwell in her role as teacher and Director of JBHS's STC, including but not limited to inappropriate touching; inappropriate sexual comments; harmful and abusive language; assault; battery; emotional and psychological abuse and manipulation; allowing sexual assaults to happen under her direction; declining to remove or otherwise discipline perpetrators of same; and her provision of drugs to at least one student.

3.      Kris Andrews ("Mr. Andrews"), former JBHS employee and director of the tech department of the STC, along with Cornwell, also subjected STC students to inappropriate and illegal behavior, including but not limited to inappropriate sexual touching and comments; harmful and abusive language; assault; battery; emotional and psychological abuse and manipulation; allowing sexual assaults and activity to occur under his direction; and declining to remove or otherwise discipline perpetrators of same.

4.      Defendant employed Cornwell and Mr. Andrews as theatre teachers and directors despite, on information and belief, having previously been made aware of their inappropriate and dangerous behavior with students.

5.      Upon information and belief, there were multiple complaints made to AISD regarding Cornwell's behavior. Plaintiffs remember being terrified of Cornwell's backlash if she heard that any of her students' parents were complaining. Indeed, Cornwell would play the phone messages she received from parents complaining out loud to students, purposefully targeting and embarrassing the student.

6.      Upon information and belief, Defendant terminated Kris Andrews in 2004 for, among other things, conduct involving inappropriate touching of an STC student, as well as inappropriate sexual comments to STC students.  Even though Defendant had already been put on

notice of previous misconduct by Mr. Andrews, including that he frequently left students unattended in class to leave go off-campus and smoke marijuana, Mr. Andrews remained employed by AISD through 2004. Indeed, upon information and belief, Mr. Andrews has been since hired by AISD to come back to Bowie High School in various ways to teach and coach students through at least 2019.

7.      Upon information and belief, Mr. Andrews has since been allowed to return to campus to help with the one-act play UIL competitions that the STC competes in.  Defendant has also paid Mr. Andrews for his professional services during at least the school years spanning 2017-2019.

8.      Defendant was also aware of the numerous incidents of STC students experiencing extreme distress and anxiety at school, with multiple students ultimately forced to leave JBHS or shift to a home-school scheme of attendance because of the abuse they suffered at the hands of the STC's theatre directors.

9.      Defendant recently named JBHS's new theater after Cornwell, with all the accompanying public accolades given to Cornwell as the longtime director of the STC. The resolution in support of the naming of JBHS's state of the art theater stated that "Diane 'Betsy' Cornwell has been committed to creating a culture of fine arts educational stewardship in Austin Independent School District for over 40 years." This public praise of Cornwell allowed Plaintiffs to revisit their damaging experiences as children at the hands of Cornwell, prompting them to finally recognize as adults the abuse they suffered and Defendant's role in recklessly disregarding it.

10.     Plaintiffs became aware of Defendant's conscious disregard for Plaintiffs' abuse and Cornwell's actions, in part, by organically speaking to other alumni after the theater's re-naming and realizing that they had the same traumatic memories. It was only due to the renaming that Plaintiffs, in speaking amongst themselves and to others, were able to recognize that Cornwell's behavior and AISD's failure to protect them was unlawful. During their revisiting and relating their memories, Plaintiffs have also learned from countless other alumni, parents, and teachers—current and former—that Cornwell's unlawful conduct has continued unabated despite multiple reports throughout the entirety of her tenure.  Not only did Defendant repeatedly decline to obstruct or even further investigate the misconduct: it now proudly holds Cornwell out as an example of excellence, notwithstanding Defendant's awareness of the legacy of complaints against her, Kris Andrews, and the STC generally.  Despite the clear suffering endured by so many STC students for so long throughout Cornwell's tenure, Defendant chose to praise Cornwell and publicly applaud her decades of employment with AISD.

11.     Additionally, the extensive news and media coverage following the filing of Plaintiffs' Original Complaint—which prompted many former STC alumni to come forward and share their memories of mistreatment and mishandled or ignored reports involving Cornwell, Mr. Andrews, and the STC—revealed Defendant's long tradition of ignoring complaints and misconduct that it was aware of against the STC and its abusive directors.

12.     Defendant's "naming" caused tremendous emotional distress to Plaintiffs and many others.  Rather than protect STC students at any point over Cornwell's three-decade-plus tenure as director of the STC, Plaintiffs have been forced to remember in detail the abuse they suffered and to grapple with the pain of knowing it continues to be ignored and denied by Defendant, who has

only acted to praise and commend their assaulter for her tenure of abuse.  Upon information and belief, Defendant continues to employ and compensate Cornwell to this day.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367, which confers supplemental jurisdiction upon this Court for all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

14.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

15.     Plaintiff Walden Hagelman is a resident of Texas.

16.     Plaintiff Sarah Andrews is a resident of Texas.

17.     Plaintiff Andie Haddad is a resident of Texas.

18.     Plaintiff Dana Havlin is a resident of Texas.

19.     Plaintiff Erika De Los Santos is a resident of Texas.

20.     Plaintiff Luke Fisher is a resident of Texas

21.     Plaintiff Rose Collins is a resident of Texas.

22.     Plaintiff Sarah Alessandro is currently a resident of Colorado.

23.     Plaintiff Suzanne Edwards is a resident of Texas.

24.     Defendant AISD is an independent school district with its principal administrative office address at 4000 S. I-H 35 Frontage Road ESC Region 13 Austin, Texas 78704 and is authorized to do business in Texas.

## FACTUAL BACKGROUND

### FACTS COMMON TO ALL PLAINTIFFS

25.     Plaintiffs are all former students of James Bowie High School.

26.     Plaintiffs attended JBHS between the years 2004-2019.

27.     Plaintiffs were all involved in the Theatre Program at JBHS.

28.     Plaintiffs were all involved in the Starlight Theatre Company at JBHS between the years 2004-2019.

29.     Plaintiffs were all subjected to inappropriate harassment, abuse and other damaging conduct by Cornwell during their time as students in the STC. Defendant caused Plaintiffs to endure the abuse where it was aware of Cornwell's abuse and of the legacy of abuse by STC directors in the program more generally, and yet did nothing to protect Plaintiffs from such abuse or otherwise prevent it from continuing.

30.     Upon information and belief, Mr. Andrews and Marco Bazan ("Mr. Bazan"), a JBHS teacher and co-director of the STC, were aware of the abusive behavior of Cornwell and yet failed to report it, despite their obligation to do so as mandatory reporters under Title IX.  Cornwell, Mr. Andrews, and Mr. Bazan were further aware of incidents of sexual assault, both against and perpetrated by STC students. They not only failed to report these incidents, but further—they brushed aside concerns from students and refused to punish or otherwise remove the perpetrators from full participation in the STC alongside their victims.

31.     Plaintiffs were all harmed by Defendant's refusal to take any action regarding Cornwell's and Mr. Andrews' conduct. Plaintiffs were further injured by Defendant's decision to

name the new theater space at JBHS after Cornwell, placing her name forever on the space that Cornwell used to abuse students, harass students, and allow the sexual assault of students to occur.

32.     Plaintiffs did not recognize the true extent of their injuries or Defendant's direct involvement in their injuries until approximately January 2022, when they learned of the naming of the new theater space. Only then did Plaintiffs reconnect and process their individualized experiences as abusive and recognize that their experiences were part of a broader failure on the part of Defendant to recognize and remedy dangerous conditions within JBHS, instead allowing Cornwell to have complete control over the STC and to continue to perpetuate the emotionally, physically, and sexually abusive damaging environment that the students were forced to endure.

33.     As a member of the STC, Plaintiffs spent 12 hours a day at school, most of the time in theater with the company. That needed to be a safe space for them as their second home. It was not. It was a toxic culture led by Cornwell using her power over vulnerable students in ways that caused lifelong harm.

34.     Each of the Plaintiffs had to participate in and witness "emotional recall" exercises. These exercises, led by Cornwell, forced students to recall their most traumatic, emotional experiences, and then relive them in front of their peers. There was no counseling available, no promise of confidentiality, and absolutely no action taken by Cornwell to make sure that the Plaintiffs and their classmates were not emotionally harmed by these exercises. These "emotional recalls" included students recalling physical attacks, attempted suicides, eating disorders, sexual assaults, medical traumas, the death of loved ones, and many other highly traumatic events that caused Plaintiffs, who were children at the time, to be emotionally scarred for years.

35.     These mandatory "emotional recall" exercises allowed Cornwell to break down students to the point that they were emotionally distraught and vulnerable, and allowed her to learn

the biggest fears.  Cornwell then used this knowledge to manipulate and control Plaintiffs and force them to do things that were uncomfortable, but they did not realize as abusive as they were children and were told they were doing it for "good theater."

36.     Each of the Plaintiffs remember "romance" or "kissing" rehearsals. During romance rehearsals, Cornwell called students into a special session in the evening and directed them to intimate sexual relations, including "making out," and stimulating sexual intercourse, not only with open mouth kissing, but also with heavy groping, including both above and beneath clothing; and tumbling around the theatre floor as students groped each other in complying with Cornwell's directive to "have sex."  Even if not instructed to engage directly in the romance rehearsals, each of the Plaintiffs recalls hearing about these rehearsals and knowing that they regularly occurred.

37.     Each of the Plaintiffs remember Cornwell touching male students in a way that made them uncomfortable. Cornwell would task herself with using stage make-up to paint abs on the boys in the STC, tickling them as she did so.  Cornwell would tickle and inappropriately touch students at other times as well, including making them sit on her lap and stroking them and pinching them.

38.     During Plaintiffs' tenure at JBHS, the theater and fine arts department and the students who were a part of it at JBHS were strictly controlled by Cornwell. The theatre was separated from the rest of the school by a hallway that could be locked by Cornwell. Plaintiffs remember that during the "romance" or "kissing" rehearsals in the evenings, Cornwell would make sure the lights were off in the hallway, she would lock the doors to the theater so nobody would come in, and when they were not locked, students who dared enter the theatre during such a session were aggressively berated by Cornwell.

39.     Upon information and belief, Cornwell's control over the theater was able to continue in the newly opened Fine Arts building at JBHS in 2022.  Upon information and belief, there are only two keys to the new Fine Arts building, and Cornwell insisted that both keys remain in her sole possession.

## FACTS RELEVANT TO WALDEN HAGELMAN

40.     Walden Hagelman ("Ms. Hagelman") was a student at JBHS from 2010-2014.

41.     Ms. Hagelman participated in the STC from 2010-2014.

42.     During her time in Defendant Cornwell's Theatre II class, Ms. Hagelman was made to participate in the "emotional recall" exercises.

43.     Ms. Hagelman, doing her best to gain Ms. Cornwell's approval, chose to speak about the eating disorder she was in the process of trying to recover from.

44.     After giving the speech she had memorized on the topic in a circle of her peers in a darkened classroom, Ms. Cornwell forced Ms. Hagelman to kneel, hold her torso, and count each rib that she could feel out loud. She was forced to do this by Defendant Cornwell as a "trigger," because Defendant Cornwell felt that her performance was not emotional enough. This experience was horrifying for Ms. Hagelman.

45.     Ms. Hagelman recalls that Defendant Cornwell bragged about kissing Plaintiff Andrews before a show.

46.     During her time at STC, Ms. Hagelman was also cast in racially and sexually inappropriate musicals. During the STC's production of *Hairspray*, every student of color was cast as a Black character, regardless of their actual race, and were told to darken their skin for the roles.

47.     Similarly, Ms. Hagelman, a white woman, was cast as a Vietnamese sex worker in the STC's production of Miss Saigon. Ms. Hagelman was forced to give lap dances and intimate

sexual acts on her male peers on stage and was encouraged by Defendant Cornwell to get a spray tan, dye her hair black, and paint on winged eyeliner in order to "look the part" of a Vietnamese character.

48.     Upon information and belief, this stage performance was so sexually inappropriate that complaints were made to JBHS and to the AISD Superintendent.

49.     In or around the spring of 2013, when Ms. Hagelman was 16 years old, she was cast in the UIL One-Act play *Front*, a prestigious and competitive production. A few weeks into rehearsal, Ms. Hagelman and the male student playing her spouse were called into a rehearsal alone with Cornwell. This was known as an "romance" or "kissing" rehearsal.

50.     This rehearsal took place in the evening, in the locked theatre, with the hallway lights purposefully turned off. Cornwell directed Ms. Hagelman and her male counterpart to step onto the stage. All the lights in the theatre were turned off except for the spotlights downstage. Cornwell sat in the front row and made it clear that the rehearsal had been called to address the scene where Ms. Hagelman and her scene partner were to kiss. Cornwell had previously critiqued the kiss for appearing "juvenile."

51.     Ms. Hagelman and her scene partner ran the scene a few times and Ms. Hagelman felt good and that she should be done with the rehearsal. Cornwell, however, continued to be visibly frustrated and angry with Ms. Hagelman and her scene partner, until she stopped the scene altogether. Cornwell told Ms. Hagelman and her partner that they looked "like children" and that they should "look like grown adults who were married and in love." Cornwell instructed Ms. Hagelman's scene partner to stand behind her and put his arms around her waist. Ms. Hagelman began to feel anxious at this point but continued to run the scene to appease Cornwell. Cornwell

had manipulated the students in STC so that they knew that they had to do exactly what she asked or she would retaliate against them. Cornwell's approval was everything to Ms. Hagelman.

52.     Eventually, Cornwell erupted angrily and told Ms. Hagelman and her scene partner to stop running lines and to kiss. She began to coach Ms. Hagelman's scene partner on how to kiss Ms. Hagelman and hold her body. Cornwell told him to press her closer, to push his hips into her back, to run his hands up and down her torso. Ms. Hagelman did not consent to any of this. Cornwell wanted Ms. Hagelman's scene partner (a teenage boy), to look like he "sexually desired" Ms. Hagelman (a teenage girl). This "coaching" went on for a long time. Cornwell eventually stood up and yelled that she "didn't believe [Ms. Hagelman and her scene partner]" and told Ms. Hagelman's scene partner to "prove it!" referring to his sexual desire for Ms. Hagelman.

53.     On Cornwell's urging, Ms. Hagelman's scene partner then put a hand under her shirt, grabbed her breast, and put his other hand down under the waistband of her jeans, all while squeezing her tightly to him. His hands then grabbed her, with one hand groping her breasts under her shirt and with his fingertips under her bra, and his other hand on her groin under her pants and underwear without her consent. Ms. Hagelman stopped breathing and her body went rigid.

54.     Ms. Hagelman's scene partner froze when he heard her sharp breath and felt her body lock up. He stepped back from her. Ms. Hagelman and her scene partner both stood there, stunned, looking at their teacher. Cornwell beamed and clapped telling Ms. Hagelman and her scene partner that she finally believed that her scene partner "sexually desired" Plaintiff Hagelman and that they had done a good job.

55.     After this encounter, Cornwell dismissed Ms. Hagelman's scene partner with the keys to the theatre and told Ms. Hagelman to come off the stage and speak with her. When Ms. Hagelman did so, Cornwell pulled Ms. Hagelman into her lap, smiling. With a hand on Ms.

Hagelman's upper inner-thigh, Cornwell proceeded to rub Ms. Hagelman's back, telling her that she had "made [her] proud" and that Ms. Hagelman had proven that Cornwell's trust in her had not been misplaced.

56.     When Ms. Hagelman was dismissed, she was very distressed, and ran into her scene partner again. Ms. Hagelman was leaning over a couch in the officer area when he came behind her, leaned into to her, and put both his hands on the couch next to her sides such that she could not move. Ms. Hagelman felt his erect penis through their clothing. He told her "what if I just took you right here." Ms. Hagelman told him to stop and he pulled away. Ms. Hagelman remembers he looked very embarrassed.

57.     Later that same semester, Ms. Hagelman was raped by a STC alumni student. When Ms. Hagelman's rapist had been a student in the STC, he was one of Cornwell's favorites, and Cornwell still glorified him and spoke about him all the time.

58.     It was widely known that girls were regularly discouraged from reporting sexual abuse in the STC. Ms. Hagelman had previously heard multiple stories about female students reporting sexual assaults or abuse to Ms. Cornwell and/or Mr. Bazan and they were turned away and told not to report it.

59.     Ms. Hagelman never reported her rape because she knew that if she did, she would have been silenced or exiled from the STC. The theatre meant everything to Ms. Hagelman and it was her entire life when she was a high school student.

### FACTS RELEVANT TO SARAH ANDREWS

60.     Sarah Andrews ("Ms. Andrews") was a student at JBHS from 2008-2012.

61.     Ms. Andrews participated in the STC from 2008-2012 as a company member and an elected company officer, ultimately serving as co-president for the 2011-2012 school year.

62.     Cornwell would use the "emotional recall" exercise to learn the students most private secrets, and she would them weaponize this information against the students. Plaintiff Andrews also remembers Cornwell maliciously gossiping about students, including Ms. Andrews. Plaintiff Andrews vividly remembers Cornwell throwing items, like shoes, at her and other performers if she was not happy. Cornwell would leave abusive notes up directed at students for all the company to see.

63.     Plaintiff Andrews remembers it as a constant barrage of abuse. Due to the constant beratement by Cornwell, Ms. Andrews experienced extreme distress and suicidal ideation.

64.     In or around 2009, when Ms. Andrews was 14 years old, she was cast in the STC production of *"The Sound of Music."* Cornwell's abusive teaching methods inspired Ms. Andrews to write in her diary how much Cornwell was yelling at her, and that even though everybody told her she was incredible in the role, "only Cornwell's opinion matters." Cornwell had complete control over the STC. The students knew it, and they knew they had to abide by her rules, take her abuse, and do exactly what she said, or Cornwell would retaliate against them.

65.     In or around 2012, the STC was rehearsing a production of *The Crucible*. Cornwell planned an "explorative emotional rehearsal." Ms. Andrews and her peers immediately knew they were in danger.

66.     Cornwell began the rehearsal in the theatre, with the entire cast standing in a circle to emulate the feeling of the tight-knit and claustrophobic society in the play. Cornwell immediately instructed the students playing Abigail (Plaintiff Andie Haddad) and John Proctor to meet in the middle of the circle and begin to be intimate with each other, first kissing upright while the students around them yelled at them and jeered. Cornwell eventually instructed the students

playing Abigail and John Proctor to roll around on the floor, emulating illicit sex, kissing with open mouths and groping each other as the rest of the students were forced to watch.

67.     While this was happening in front of them, Cornwell began to shove Ms. Andrews. Ms. Andrews was playing the jilted wife character, and Cornwell told her to look on and focus on how dejected she felt and to think about how it would feel to be a wife cheated on by her husband, punctuating each barbed suggestion with a little shove to keep her off-balance.

68.     Cornwell knew that Ms. Andrews parents had begun experiencing marital issues that year, stemming from infidelity, and Cornwell used this private information to emotionally torture Ms. Andrews.

69.     Eventually, Cornwell moved the students into the black box theatre room (a smaller, darker theatre space) where she continued to escalate the tension of the rehearsal. Overhead lights were turned off, stage lights were turned on, tense and ambient music was played, and large quantities of stage blood were brought out. At first, the students were instructed to act out scenarios referenced in the text of *The Crucible* but not even part of the STC production: students playing the "hysteria girls" were gathered onstage in a circle and told to dance about in a circle. Cornwell had stage blood poured all over them to simulate witchy rituals. The students playing Abigail and Proctor were again made to simulate their intimate sexual affair in front of their peers and Ms. Andrews was forced to watch and emotionally react.

70.     When Ms. Andrews was still not reacting the way Cornwell wanted her to, Cornwell pulled Ms. Andrews aside and began to speak to her very close to her face, saying, "Do you know what people say about you? Do you know what they really think about you? That you aren't talented, that you don't deserve the roles you're cast in. That you're stuck up. That your younger sister is so much more talented than you and so much prettier than you. That you are the

reason your parents are having issues with their marriage." Cornwell continued to insult and harass Ms. Andrews until she broke down hysterically sobbing.

71.     Cornwell knew how worried Ms. Andrews felt about her parents' marriage, how worried she felt for the little sister she would be leaving behind in a few months when she left for college in a different state, and how much guilt and worry she carried over her health issues. Defendant Cornwell used this information to emotionally torture Ms. Andrews.

72.     After Defendant Cornwell finally succeeded in breaking Ms. Andrews down, they were told to run through the entire show again, with exaggerated faces and blocking but no lines. The rehearsal became more and more violent as it continued, with Cornwell encouraging students to toss each other around and crash into walls, inspiring panic in Ms. Andrews and her peers. At the end of the rehearsal, Cornwell proceeded to denigrate the students' performance, and then sent them to their next class emotionally and physically distraught.

73.     Only a few weeks after this rehearsal, as Ms. Andrews and two of her male peers stood backstage about to perform at a UIL competition, Cornwell approached Ms. Andrews and the two boys. Immediately before the timer went off to signify the end of their setup period, Cornwell quickly grabbed Ms. Andrews' face and kissed her on the lips, grabbed the boy next to her and kissed him on the lips, and slapped the second boy before walking offstage and leaving them to their performance, shocked and unsettled by the behavior.

74.     In or around 2011, Cornwell attempted to coerce Ms. Andrews into taking a muscle relaxant that she did not need because Cornwell believed it would allow Ms. Andrews to give a more believable performance as a drug-addled character in a UIL performance.

75.     In or around 2012, Cornwell gave Ms. Andrews unidentified pain medication before the senior awards banquet where Ms. Andrews and her fellow students were to give a

performance. Ms. Andrews has no idea what Cornwell gave her, but it left her heavily sedated to the point that she blacked out.

76.     While Ms. Andrews did not understand the gravity of the abuse, Ms. Andrews was anxious and depressed, and tried to talk to other teachers about STC. However, teachers brushed aside her complaints.  The sentiment Ms. Andrews and her fellow students received from other teachers was: "You know Cornwell, that crazy woman," indicating that teachers and staff at JBHS were aware of Cornwell's behavior and yet did nothing to stop it. Therefore, Ms. Andrews thought this was how theater was supposed to be.

### FACTS RELEVANT TO ANDIE HADDAD

77.     Andie Haddad ("Ms. Haddad") was a student at JBHS from 2009-2013.

78.     Ms. Haddad participated in the STC from 2009-2013.

79.     Ms. Haddad was cast as Abigail in the STC production of *The Crucible* in or around 2012.

80.     In or around 2009, Cornwell scheduled a special rehearsal for *The Crucible*, which immediately made Ms. Haddad and her castmates fearful of what was to come.

81.     Cornwell instructed Ms. Haddad and her castmates to start on the stage of the performance theatre. The lights were turned off. Cornwell told the cast of students to stand in a circle. She then instructed Ms. Haddad to get in the middle of the circle with the boy who was playing John Proctor, her love interest in the play. Cornwell instructed Ms. Haddad and her male scene partner to act out the implied scene in *The Crucible* where John Proctor and Abigail have an affair. Cornwell instructed Ms. Haddad and her male scene partner to be intimate with each other, lie on the floor and kiss, and pretend to have sex, all in the presence of her and their fellow castmates. Cornwell instructed Ms. Haddad and her scene partner, John Proctor, to have sex – to

have an affair. This made Ms. Haddad extremely uncomfortable, but Cornwell insisted, instructing Ms. Haddad to "go have an affair with John Proctor."

82.     Ms. Haddad and her scene partner stepped into the middle of the circle of students and began kissing. This was not enough for Cornwell, who instructed Ms. Haddad and her scene partner to lay down on the floor. Ms. Haddad and her scene partner complied, laying down on the floor and continuing to kiss. Cornwell continued to yell "more, more, more!" at Ms. Haddad and her scene partner, urging them to increase their level of passion until the two teenagers were rolling around on the floor together, touching each other, and making out, including kissing with tongue and groping, all in full view of each of their castmates.

83.     Meanwhile, Cornwell had instructed the circle of students surrounding Ms. Haddad and her scene partner to jeer and insult them as they carried out Cornwell's directive to "have sex." Later during that same rehearsal, in the black box theatre that Cornwell had moved the students into, Cornwell berated Ms. Haddad, calling her a "slut," telling her that she was dirty, and that the only way people would love her is if she used her body. These comments were extremely traumatizing to the young Ms. Haddad.

84.     On another occasion, Ms. Haddad was rehearsing on stage in a corset and slip in front of her peers because her costume had not yet arrived. Ms. Haddad has since learned that while she was rehearsing, another student sat in the audience and masturbated while he watched her. Upon information and belief, this was reported and neither Cornwell nor Mr. Bazan took any action against the student.

85.     Cornwell manipulated the emotions of vulnerable students that she had under her complete control. She made Ms. Haddad feel worthless on numerous occasions.

86. Cornwell created a malicious, competitive, and manipulative environment where Plaintiffs were consistently anxious, afraid and abused.

### FACTS RELEVANT TO DANA HAVLIN

87. Dana Havlin ("Ms. Havlin") was a student at JBHS from 2011-2015.

88. Ms. Havlin participated in the STC from 2011-2014.

89. Ms. Havlin, a white woman, was cast as a Vietnamese sex worker in the STC's production of Miss Saigon. Ms. Havlin was forced to give lap dances and intimate sexual acts on her male peers on stage and was encouraged by Cornwell to get a spray tan, dye her hair black, and paint on winged eyeliner in order to "look the part" of a Vietnamese character.

90. Ms. Havlin was a junior (age 16) when she was cast in the leading role of a show. It was an honor to be cast in a leading role, and an especially big privilege as a junior. Ms. Havlin was cast across from a senior male who was her character's romantic interest. A few weeks into rehearsals Ms. Havlin saw their "romance rehearsal" on the schedule. These were infamous and regular occurrences that Ms. Havlin had heard of often. She was terrified.

91. Ms. Havlin entered the choir practice room the day of the rehearsal. Ms. Havlin remembers that she was either alone with Cornwell and the other actor, or the other student who was rehearsing her part as well was made to attend and watch. Cornwell began by instructing the students to recite lines back and forth to warm up.

92. Ms. Havlin and her male partner began by sitting next to each other on a bench, reciting their lines. Then things were escalated when Cornwell instructed Ms. Havlin and her male scene partner to kiss. Ms. Havlin had never kissed anyone before and she was very uncomfortable.

93. Cornwell then instructed the students to come off the bench and kneel facing each other and to kiss every few words or so while reciting their lines. Cornwell told them that this was

not enough, and that they should just kiss more passionately. They then began to kiss with open mouths using their tongues. This was still not enough for Cornwell.

94.     Cornwell instructed Ms. Havlin and her scene partner to lie down together, stop saying their lines and just kiss each other. She then instructed them to roll around on the floor together. Ms. Havlin's scene partner began running his hands down her sides.

95.     Cornwell eventually stopped the pair to correct Ms. Havlin, telling Ms. Havlin that "the man's legs go between the woman's." Cornwell instructed Ms. Havlin to open her legs and let her scene partner put his legs between hers. Cornwell instructed them to pretend to be having sex. Ms. Havlin was mortified and in pain from rolling around on the floor with her scene partner, but she complied with Cornwell's demands and spread her legs wider.

96.     This experience with Cornwell, coupled with Cornwell's manipulation, verbal and emotional abuse, caused Ms. Havlin to be hospitalized for suicidal ideation less than a year later.

### FACTS RELEVANT TO ERIKA DE LOS SANTOS

97.     Erika De Los Santos ("Ms. De Los Santos") was a student at JBHS from 2010-2014.

98.     Ms. De Los Santos participated in the STC from 2010-2014.

99.     Student cast members were screamed at by Cornwell, often to the point of tears. Many students involuntarily lost their first kiss "for the show" or were strongly reprimanded if they felt uncomfortable during a kissing scene.

100.    Ms. De Los Santos was made to participate in Cornwell's "emotional recall" lessons. In addition to sharing the intimate details of their traumatic pasts with a teacher and a group of peers, who were under no real obligation to maintain confidentiality, peer "mentors" were

instructed to purposely trigger Ms. De Los Santos and her peers. Ms. De Los Santos witnessed (and was forced to participate in) several disturbing "trigger" attempts.

101.    In the worst "triggering" experience Ms. De Los Santos witnessed, her classmate shared an intimate account of her father trapping her in a closet and threatening her with a knife. Cornwell instructed the peer mentor to trigger the student. The trigger involved shutting the student into a dark closet, with Ms. De Los Santos and her peers standing against the door to keep her trapped inside. Ms. De Los Santos recalls the student screaming and sobbing as she banged on the door, begging to be let out. After Cornwell felt that this student had been sufficiently "triggered" the class simply moved on, leaving the triggered student sobbing for a long time after. Ms. De Los Santos was extremely disturbed by these emotional recall exercises.

102.    Ms. De Los Santos was cast in the STC production of *Miss Saigon* in or around 2013-2014. During this production, Ms. De Los Santos lost 20 pounds. At the beginning of rehearsals for the show, Ms. De Los Santos was barely given the opportunity to stand on stage at all. However, as Ms. De Los Santos lost the weight, she received more flattering costumes and was asked to participate in more scenes. Cornwell's favoritism toward thinner cast members inspired body dysmorphia and disordered eating in Ms. De Los Santos and her female peers.

103.    Ms. De Los Santos, a woman of Hispanic descent, was also made extremely uncomfortable by the racial insensitivity of many of the productions chosen by Cornwell, including *Miss Saigon*.

104.    Ms. De Los Santos was subjected to verbal and emotional abuse at the hands of Cornwell and was so traumatized by her experiences in the STC that she began engaging in self-harm during her first year in the company. This behavior continued for years, and Defendant Cornwell, despite seeing Ms. De Los Santos daily, never once asked her about or reported the

obvious cuts up and down her arms. Ms. De Los Santos was hospitalized for suicidal ideation during her senior year of high school, when Defendant Cornwell's abuse of Ms. De Los Santos as an STC student officer had caused Ms. De Los Santos to develop an eating disorder.

### FACTS RELEVANT TO ROSE COLLINS

105.     Rose Collins ("Ms. Collins") was a student at JBHS from 2015-2019.

106.     Ms. Collins participated in the STC from 2015-2019.

107.     During her time in Defendant's STC program and Theatre classes, Ms. Collins was forced to participate in the emotional recall exercises. Cornwell graded performances on students' willingness to be "intense enough." Cornwell berated and demeaned Ms. Collins because she chose to recall a "happy memory," giving her a lower grade for not selecting to share a more traumatic memory in front of the class.

108.     During her freshman year, Ms. Collins was cast as a gorilla in the STC's production of *Tarzan*. At Cornwell's insistence, students cast as gorillas had to get spray tans, get cornrows or wear a wig, and they had to be painted in what looked like tribal-themed face paint.

109.     Due to the constant abuse by Cornwell in the STC, Ms. Collins' mental health began to rapidly decline. In her freshman year, Ms. Collins began to engage in self harm. Out of concern for her daughter, Ms. Collins' mother called Cornwell requesting that Cornwell check in on Ms. Collins since Ms. Collins spent so much time in theatre with Cornwell. Cornwell assured Ms. Collins' mother that she would watch out for her.

110.     However, Cornwell did not watch out for Ms. Collins or otherwise express concern for her well-being. Instead, Cornwell hand-selected the tank-tops, sleeveless dresses, and other short-sleeved costumes that she forced Ms. Collins to wear for her roles, visibly showing where

she was cutting herself.  Cornwell never inquired into her well-being; she only intentionally caused her more suffering.

111.    During her sophomore year, Ms. Collins was forced to call a fellow student's parents after witnessing a STC director lock her fellow student in the theater while screaming at her for twenty minutes about lack of work ethic and professionalism.

112.    Another student witnessing this went outside to the parent pick-up line to try to find an adult who would help, after which the student's father was telephoned to come to the school to help his daughter leave the theater.

113.    Following this incident, the student's mother requested a conference with Cornwell regarding the incident where her child was locked in the theater. Cornwell told the parent that she needed to handle it internally, and that it need not be reported to the administration because she alone could handle it.

114.    Because Ms. Collins and her fellow student had called for help, and essentially reported this incident to parents, Hannah Huerta—the offending director—told Ms. Collins and the other student that she was going to tell Cornwell to blacklist them. Afterwards, despite their exceptional commitment to the STC, Cornwell refused to give them the officer positions that they were entitled to. This was a huge deal to members of the STC, as being a director was incredibly important to them.

115.    Also during her sophomore year, Ms. Collins was cast in a show in which she played the role of a wife who had been cheated on. During rehearsals, Cornwell instructed Ms. Collins to reach out to male students to "prevent them from leaving," commanding that she be very physical with them as they pulled away from her.  Ms. Collins was very uncomfortable with the degree to which Cornwell would physically touch, grab, and hold the male students.

116. Cornwell instructed other students to physically restrain Ms. Collins as she complied with Cornwell's demand to "break from the restraints" and reach out to the male students "leaving her." Ms. Collins remembers other students grabbing her around her waist and pulling her back as she attempted to "break free" as instructed.

117. This was very traumatizing to Ms. Collins, as the males were restraining her against her will under the direction of Cornwell. Even though Ms. Collins was distressed, Cornwell ordered them to keep going.

118. Ms. Collins remembers students being forced to change down to their underwear in the hallways during performances, with all students of all genders required to openly change in front of one another. For a dress Ms. Collins was required to wear in one performance, Cornwell told her she could not wear a bra with it. Ms. Collins was still required to change in the hallway in front of everyone, with her bare breasts exposed for everyone to see.

119. During her junior year, Ms. Collins was sexually assaulted by another student in the STC.

120. Ms. Collins reported the sexual assault with Cornwell and another STC director at the time. The other STC director brought Ms. Collins to the counselor to report it.

121. During the meeting with the JBHS counselor, Ms. Collins was told that her only option was to file a police report against the student. When Ms. Collins explained that she did not know if she would be comfortable doing that, the counselor informed Ms. Collins that there was nothing else JBHS could do, and Defendant refused to take any other actions. Ms. Collins was told that Cornwell would have to oversee the situation with Ms. Collins and her assaulter going forward.

122.    Cornwell forced Ms. Collins to continue working alongside this student, frequently requiring her to physically work close to her assaulter. The student who assaulted Ms. Collins was a "pet" favorite of Cornwell's, and he remained one of her favorites even after Ms. Collins reported to Cornwell that he sexually assaulted her.  As Ms. Collins had been previously denied an officer position for reporting STC incidents outside of the STC, Ms. Collins knew that she had to suffer and endure it if she did not want to be removed from the theater program entirely.

123.    Ms. Collins was repeatedly traumatized from having to remain in contact with her sexual assaulter and watching him remain a favorite despite her reporting him. Ms. Collins felt she had no choice but to again express to Cornwell that she was uncomfortable working alongside her assailant.  Cornwell informed Ms. Collins in no uncertain terms that if she was unable to work alongside her assailant, she would either be removed from the program or not get any roles.

### FACTS RELEVANT TO SARAH ALESSANDRO

124.    Sarah Alessandro ("Ms. Alessandro") was a student at JBHS from 2007-2011.

125.    Ms. Alessandro participated in the STC from 2007-2011.

126.    Ms. Alessandro recalls that as part of a performance, Cornwell instructed students to stand off-stage and audibly create the impression that sexual intercourse was occurring. To simulate sexual intercourse happening off-stage, Cornwell instructed the students to loudly make sexually suggestive sounds from so the audience would believe student actors were having sexual intercourse outside the visible scope of the scene.

127.    Ms. Alessandro remembers hearing that this performance prompted parent complaints to Defendant about the off-stage "sexual intercourse."

128.     During her freshman year, Ms. Alessandro was allowed to audition for *Aida*, a musical set in Egypt. White students were only allowed to audition if they agreed to get spray tans and either braid their hair or get cornrows.  Ms. Alessandro did not audition for this reason.

129.     Also during her freshman year, Ms. Alessandro was cast in a play directed by Mr. Bazan about a fire in a shirt-waist factory. While Mr. Bazan was away, Cornwell covered the rehearsals for him. During one of these rehearsals, Cornwell turned off the lights in the theater and directed the students to sprint around the theater, simulating panic and fear.

130.     The simulated fear became real when Cornwell started to scream at the students, telling them they should be better, that they should be more scared. Subsequently, Cornwell intentionally tripped Ms. Alessandro, pulling her off the stage and onto the floor by her ankle as Cornwell laughed hysterically. Ms. Alessandro was terrified, but rather than show it and risk disappointing Cornwell, she instead laughed nervously and continued rehearsing, trying to stay as far away from Cornwell as she could for the rest of the rehearsal.

131.     During her time in Defendant's STC program, Ms. Alessandro participated in the emotional recall exercises.  Ms. Alessandro had to share her mother's suicide attempt, as she thought this would be traumatic enough for Cornwell to give her a good grade. However, after Ms. Alessandro shared this painful memory, Cornwell instead berated Ms. Alessandro for being "not good enough" and for acting "like a third grader."

132.     Cornwell continued to berate and criticize Ms. Alessandro's acting and intelligence throughout her time in the STC, telling her she "wasn't smart enough."

133.     Ms. Alessandro recalls Cornwell making students wear sexually suggestive costumes, and further remembers that Cornwell constantly inappropriately physically touching male students.  Cornwell would sit on these male students and tickle them or she would make the

male students sit in her lap as she tickled them. Ms. Alessandro also vividly remembers Cornwell meticulously painting abs on shirtless male students, taking her time and caressing their bodies.

134. By the time she reached her senior year at JBHS, Ms. Alessandro began to struggle with suicidal thoughts from the constant abuse in the STC.

135. At the end-of-year "Stars Banquet," Ms. Alessandro remembers that students would sit in a circle as the seniors stood up one at a time to offer their "senior goodbyes." Often lasting until midnight, parents were not allowed to attend this event. Ms. Alessandro remembers that when Cornwell's "favorites" offered their goodbyes, Cornwell would cry, hug, and kiss these students. Where students she disliked said goodbye, Cornwell was stone-faced.

136. When Ms. Alessandro said her goodbye, she cried as she told Cornwell that she just wanted Cornwell to like and approve of her.  Since learning of the "naming" of the Theatre, Ms. Alessandro has been forced to painfully recognize the trauma associated with her experience in the STC, and she has s struggled with the knowledge that AISD allowed Cornwell to abuse so many students.

### FACTS RELEVANT TO SUZANNE EDWARDS

137. Suzanne Edwards ("Ms. Edwards") was a student at JBHS from 2000-2004

138. Ms. Edwards participated in the STC from 2000-2004.

139. During her time in Defendant's STC program, Ms. Edwards was required to participate in emotional recall as part of the course curriculum.

140. Cornwell routinely instructed older "Senior Director" students to run emotional recall sessions. With Cornwell watching, and at the direction of a Senior Director student, Ms. Edwards shared the experience of her childhood abuse at a daycare center during her emotional recall. Ms. Edwards shared this experience because to make a good grade in the course, she

needed to share something painful. Ms. Edwards remembers this as a very painful, traumatic experience.

141.    During her freshman year, Ms. Edwards was directed to perform a highly sexualized chair dance for Cornwell to watch as part of her "lip synch" assignment.

142.    Ms. Edwards was told to perform the lap dance to "Mein Herr" ("My Man"), a song from "Cabaret." The traditional choreography for the number was highly sexually suggestive. Ms. Edwards was very uncomfortable with that, so she opted to perform a milder version with less sexually suggestive choreography.

143.    After seeing Ms. Edwards' performance, Cornwell told Ms. Edwards that she needed to "ratchet it up." Ms. Edwards remembers wanting to impress and gain Cornwell's approval where she seemed suddenly to have an uncharacteristic interest in working one-on-one with Ms. Edwards. Cornwell instructed Ms. Edwards to get on the floor, lay on her back, bend her knees, and to make upward hip thrusting motions as if she was having sex. As Cornwell coached Ms. Edwards through this motion, the corresponding lyrics to the song were "inch by inch . . . mile by mile."

144.    Cornwell's "teaching" required Ms. Edwards to mimic sexual intercourse.

145.    While Ms. Edwards was very uncomfortable doing so, she complied with Cornwell's instructions where she believed it was part of the curriculum, necessary to make a good grade, and that it might gain her Cornwell's approval. Previously, Cornwell consistently expressed disapproval regarding Ms. Edwards' participation in the STC.

146.    During Ms. Edwards' senior year, the STC students had a field trip to be extras in a movie at UT's football stadium. Students were instructed to stand up, raise their hands, and cheer on cue as if they were the crowd in a game.

147.    When Ms. Edwards raised her hands up, her shirt apparently lifted to reveal a small section of her stomach.

148.    Cornwell and Mr. Andrews publicly mocked Ms. Edwards in front of the other students for the appearance of her stomach and the clothes that she wore.

149.    Upon return to AISD, Cornwell and Mr. Andrews pulled Ms. Edwards into Cornwell's office where they berated her clothing choice.

150.    Mr. Andrews grabbed her by the hips and physically turned Ms. Edwards' body, angling her towards Betsy and saying "see, look how bad this is. Look at how unflattering this shirt is," while eyeing her body and making her feel highly uncomfortable. Cornwell nodded in agreement.

151.    Ms. Edwards participated in the STC's senior trip to New York City ("NYC") the summer before her senior year.

152.    While in NYC, Ms. Edwards was sexually assaulted by a stranger on the subway. Terrified, Ms. Edwards immediately reported what happened to Cornwell and Mr. Andrews. Mr. Andrews again looked at Ms. Edwards in a way that made her uncomfortable, and responded "yeah I saw that, we just need to make you more resistible." Cornwell nodded in agreement.

153.    Ms. Edwards felt humiliated and ashamed after reporting her sexual assault to Mr. Andrews and Cornwell.  She remembers feeling that the assault was somehow her fault, reflecting on whether it might be true that her jeans, camisole, and shawl she wore were not "resistible" enough to expect that strangers would refrain from similar sexual assaults.

154.    For her role as "cleaning lady" in James Taylor's "Working" musical, Ms. Edwards was forced to wear a romper/onesie costume that was far too small for her.  Too short for her torso, the costume strained to cover the full length of her torso such that her groin area was outlined and

emphasized in a sexual way that was deeply humiliating to Ms. Edwards.  Cornwell refused to change it. Ms. Edwards remembers that after seeing her costume during the performance, her mother was very upset and complained to JBHS.

155.    Ms. Edwards remembers other students being required to wear medieval-style costumes that exposed and emphasized their breasts. Cornwell instructed Senior Director students to apply makeup to these students on their breasts to further enhance these students' cleavage. Cornwell alone would meticulously paint abs onto the shirtless males' torsos. Ms. Edwards now remembers that watching it made her uncomfortable.

156.    During her senior year, Ms. Edwards was in class with Mr. Andrews when he leaned across the table he was sitting at to touch her friend, a male student in the tech department who had his arms splayed out on the table at the time.  Grabbing the friend's forearm with both of his hands, Mr. Andrews began to rub his hands up and down the friend's forearm, simulating masturbation.  In reference to a recent field trip, Mr. Andrews leaned forward and said to the friend: "Such a shame you didn't go. We could've bonded in a whole new way."  Ms. Edwards saw that the friend was very uncomfortable and afraid, yet he tried to laugh it off to not cause attention.

157.    Ms. Edwards recalls that such contact and sexualized joking was intrinsic to the teachers' interactions with the students in the STC.   Cornwell and Mr. Andrews would gravitate towards male students, especially those playing lead roles in productions.   Cornwell would frequently touch, stroke, and pull male students onto her lap, holding them there close to her as she laughed uproariously.   Ms. Edwards and other students were made to believe that sexual promiscuity was just "part of the production," and that it was part of the required culture of theater otherwise.

158.    During her senior year, Ms. Edwards and two other students reported Mr. Andrews to counselor Barbara Hoffman. Detailing their complaints against Mr. Andrews in notes, the three students signed the others' accounts in corroboration.  After speaking with Ms. Hoffman about their complaints, Ms. Hoffman told the students that "she was forced to report this" and called a meeting with Principal Ewing.

159.    One of the student's accounts detailed an incident where Cornwell and Mr. Andrews, in the course of driving students to a field trip, made a stop to a liquor store to buy alcohol.

160.    The meeting with Principal Ewing was attended by Ms. Hoffman, the three students, Principal Ewing, and Ms. Edwards' mother.  During this meeting, the students shared the accounts detailed in their notes, referencing Cornwell's actions in conjunction with her complaints against Mr. Andrews.  Particular to Cornwell, they reported the liquor store stop on the way to NYC and how Ms. Edwards had been berated for her clothing and her body by Mr. Andrews and Cornwell after the trip to the football stadium.

## FACTS RELEVANT TO LUKE FISHER

161.    Luke Fisher ("Mr. Fisher") was a student at JBHS and a member of the STC from 2014 – 2018.

162.    During his last year at JBHS, Mr. Fisher was forced to finish high school at JBHS under a home school scheme due to the abuse by Cornwell under which he attended school at JBHS from home and remained a member of the STC.

163.    As soon as Mr. Fisher joined the STC freshman year, and before Cornwell even became his teacher sophomore year, she identified and treated Mr. Fisher as one of her "pet"

students. Mr. Fisher remembers that Cornwell gravitated towards male students who had a certain physical appearance.

164.    After becoming Mr. Fisher's teacher his sophomore year, Cornwell would call Mr. Fisher into her private office during most class periods, requiring that he sit on her lap. Once Mr. Fisher sat in her lap as instructed, Cornwell would proceed to pinch and tickle him inappropriately. Cornwell's touching made Mr. Fisher extremely uncomfortable and caused him to feel incredibly anxious.

165.    Mr. Fisher felt compelled to go along with Cornwell's touching, because he feared her retaliation greatly, and theatre was Mr. Fisher's main passion and Cornwell had complete control over JBHS's theatre program. Mr. Fisher also felt that making a big show of being an unwillingly participant in her touching would have been even more embarrassing than just trying to endure it.

166.    When Mr. Fisher tried to tell Cornwell that he was feeling anxious and depressed, Ms. Cornwell laughed at him and told him he could not be depressed. Cornwell told Mr. Fisher to take medication and get on with it and stop complaining.

167.    Because Cornwell's office had large windows, the entire theatre classroom could see Cornwell pinching and tickling Mr. Fisher as Cornwell held him in her lap in her office.  Since it was obvious that Mr. Fisher was one of Cornwell's "pets," other older students in the STC warned Mr. Fisher to be careful since "Cornwell is a touchy one."

168.    After months of enduring Cornwell's constant touching and attention, and his anxiety and depression worsening, Mr. Fisher attempted to speak to Mr. Bazan, and tried to tell him that Ms. Cornwell's constant touching and groping made him uncomfortable. However, Mr.

Bazan immediately dismissed Mr. Fisher's concerns, and told him he was overreacting to what he claimed was merely the way Cornwell was.

169.    After speaking with Mr. Bazan, Mr. Fisher did not know what to do, and thought that he had to keep enduring the inappropriate touching to keep being involved in theater. Mr. Fisher attempted to avoid Cornwell's physical touches by just not going in her office without another student with him. He also attempted to show Cornwell that he was not comfortable when Cornwell pulled Mr. Fisher into her lap and tickled him.

170.    Mr. Fisher began to struggle with extreme anxiety daily at school.

171.    However, as soon as Mr. Fisher tried to remove himself from Cornwell's inappropriate touching, and put some boundaries up, Cornwell retaliated against Mr. Fisher. Cornwell told Mr. Fisher that she was going to remove his name from the officer ballot, and he was no longer able to become a senior director – effectively shutting him out of involvement with the STC.

172.    Mr. Fisher eventually told his parents about his anxiety, telling them it was due to his coursework and issues with the theater department, but at the time, he could not explain why.

173.    Concerned about his well-being, Mr. Fisher's parents talked to the JBHS principal about Mr. Fisher's intense anxiety as a member of the STC. The JBHS principal did not inquire at all as to why theater was making Mr. Fisher was anxious. Indeed, AISD's solution was for Mr. Fisher to start attend JBHS under a home-school scheme for his senior year, but still attend STC.

174.    While home-schooling, his only involvement at JBHS was on campus for the STC and for PE in the mornings twice a week.  Cornwell continued to retaliate against him and, refused to cast him in any roles in her productions. Cornwell informed Mr. Fisher that he would not be allowed to participate at all in the large annual school musical. Even though the principal had

promised Mr. Fisher that he could be involved in extracurricular activities, Cornwell told him he was "not a real student." Being completely shut out of his passion was even more damaging to Mr. Fisher.

## CAUSES OF ACTION

### COUNT 1: VIOLATIONS OF TITLE IX
### AGAINST DEFENDANT
### (20 U.S.C. § 1681, et seq.)

175.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

176.    The sex-based harassment articulated in this complaint was so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to educational opportunities or benefits provided by the school.

177.    AISD created and/or subjected Plaintiffs to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C § 1681(a) ("Title IX"), because:

   a)   Plaintiffs are members of a protected class;

   b)   Plaintiffs were subjected to sexual harassment in the form of repeated sexually inappropriate comments, directives, and threats from Cornwell, and sexual assaults under Cornwell's direction, a Teacher employed by AISD;

   c)   Plaintiffs were subjected to harassment because of their gender;

   d)   Plaintiffs were subjected to policies, procedures, and customs, including AISD's failed Title IX reporting system, that were implemented in a discriminatory manner; and

   e)   Plaintiffs were subjected to a hostile educational environment created by AISD's lack of policies and procedures and/or AISD's failed efforts to implement their policies and procedures and failure to timely investigate and address the sexual harassment of multiple students by a Teacher.

178.    On information and belief, AISD and its officials had knowledge of Cornwell's rampant harassment and abuse of students and of the history of abuse in the STC more generally, and yet failed to investigate and discipline Cornwell in a timely manner consistent with federal law.

179.    AISD failed to prevent the emotional injuries and sexual harassment and abuse inflicted by the emotional recall and romance sessions under Cornwell's direction, despite their inclusion in Defendant's theatre course curriculum for decades.

180.    AISD was aware of the STC directors' inappropriate sexualization of students and the racial insensitivity underlying the directors' instruction, as evidenced by the costumes, choreography, and subsequent parent complaints associated with STC productions.

181.    AISD subjected Plaintiffs to sex discrimination where they failed to promptly and appropriately respond to the alleged sexual harassment and abuse, which resulted in Plaintiffs being excluded from participation in, denied the benefits of, and subjected to discrimination in AISD's education program in violation of Title IX.

182.    AISD failed to take immediate, effective remedial steps to resolve Plaintiffs' complaints of sexual harassment and abuse, and instead acted with deliberate indifference towards Plaintiffs.

183.    AISD acted with deliberate indifference towards Plaintiffs where it continued to pay Mr. Andrews for his professional services and allowed him to return to campus even after terminating him based on inappropriate sexual contact with students.

184.    Plaintiffs have suffered emotional distress and psychological damages as a result of AISD's deliberate indifference to her rights under Title IX.

185.    Plaintiffs' requests for relief are set forth below.

**COUNT 2: VIOLATIONS OF SECTION 1983**
**14th AMENDMENT OF THE U.S. CONSTITUTION**
**(42 U.S.C. § 1983, et seq.)**

**SUBSTANTIVE DUE PROCESS**
**Right to Personal Security and Bodily Integrity**

186.     Throughout Cornwell's tenure, Defendant developed, implemented, enforced, encouraged, and sanctioned de facto policies, practices, and/or customs exhibiting deliberate indifference to Plaintiffs' constitutional rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

187.     Defendant engaged in a custom, policy, and practice of failing to properly process and investigate reports from students and other persons regarding sexual assault, abuse, and other misconduct against students in the STC.

188.     Defendant's refusal to prevent Cornwell's conduct and continued engagement of Mr. Andrews emboldened and empowered directors in the STC to continue abusing students and to otherwise fail to protect them against emotional, physical, and sexual assault, harassment, and abuse perpetrated by or under the direction of others in the STC.

189.     Defendant failed to properly hire, train, and retain teachers with the mandatory obligation to report sexual assault, harassment, or abuse of students. Defendant was deliberately indifferent to Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment by:

a.     Failing to adequately train teachers to respond appropriately to sexual assault, harassment or abuse that they are aware of against students;

b.     Failing to ever investigate Cornwell despite numerous complaints against her throughout her tenure, and despite clear evidence of her abusive conduct and of students' suffering from same;

c.     Continuing to allow Mr. Andrews to return to campus, despite his history of misconduct and sexual contact with students, and further compensating him for his services; and

d.     Continuing to retain Cornwell despite her acting in concert with respect to the substance of the report that ultimately was basis for Mr. Andrews' termination.

## COUNT 4: VIOLATIONS OF SECTION 1983
## STATE-CREATED DANGER
## AGAINST DEFENDANT
## (42 U.S.C. § 1983, et seq.)

190.   Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if they were fully set forth herein.

191.   AISD used its authority to create a dangerous environment for Plaintiffs by sponsoring and encouraging participation in Cornwell's directed and controlled STC.

192.   AISD knew that Cornwell's directed and controlled STC was a dangerous environment for students because, upon information and belief, AISD was aware that Cornwell abused, belittled, and harassed students.

193.   AISD, despite knowing that Cornwell posed a threat to students, continued to promote and support her as the director of the STC, giving her unfettered, isolated access to students and private theater space.

194.   When this arrangement inevitably led to emotional and physical abuse of JBHS students by Cornwell, AISD administrators were deliberately indifferent to the plight their actions had placed students into.

195.   Plaintiffs' requests for relief are set forth below.

### JURY DEMAND

196.   Plaintiffs demand a jury trial and tenders the appropriate fee.

**PRAYER FOR RELIEF**

FOR THE FOREGOING REASONS, Plaintiffs pray that Defendant be duly cited to appear

and answer herein; and that upon a final trial of this cause, Plaintiffs recover:

(i)      Judgment against Defendant for Plaintiffs' damages as set forth above, including actual, special, and punitive damages;

(ii)     Equitable relief including but not limited to: removing Cornwell's name from the JBHS theater space, instituting mandatory intimacy training for all AISD theatre programs, hiring intimacy coordinators for use in AISD theatre programs, mandatory monitoring of the STC to ensure compliance with federal law, sexual assault and harassment awareness training for all AISD theatre programs, race and sex discrimination training for all AISD theatre programs, and any other equitable relief the Court deems justified;

(iii)    Prejudgment interest at the rate of 10 percent per annum until the date judgment is entered herein;

(iv)    Post-judgment interest as allowed by law on any judgment awarded by this Court and the Jury from the date judgment is entered until paid;

(v)     Costs of court; and

(vi)    All other relief to which Plaintiffs are justly entitled.


Dated:  January 12, 2023          Respectfully submitted,

                                 */s/ Jennifer Jones Despins*
                                 Jennifer Jones Despins
                                 NY State Bar No. 4156600
                                 jdespins@equalrights.law
                                 Jay D. Ellwanger
                                 Texas State Bar No. 24036522
                                 jellwanger@equalrights.law
                                 Ellwanger Law LLLP
                                 8310-1 N. Capital of Texas Hwy, Ste. 190
                                 Austin, Texas 78731
                                 Telephone: (737) 808-2260
                                 Facsimile:  (737) 808-2238

                                 **COUNSEL FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2023, a true and correct copy of the above and foregoing document was served on all counsel of record via the Court's ECF system.

<u>_/s/ Jennifer Jones Despins_____</u>
Jennifer Jones Despins